CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

SEP 14 2016

JULIA C. DUDLEY, CLERK
BY: H McDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| GARY WALL,<br>　　Plaintiff, | Civil Action No. 7:15-cv-00097 |
| v. | MEMORANDUM OPINION |
| JEFFERY ARTRIP, et al.,<br>　　Defendants. | By:　Hon. Jackson L. Kiser<br>　　　Senior United States District Judge |

Gary Wall, a Virginia inmate proceeding pro se, commenced a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff names staff of the Red Onion State Prison ("ROSP") and Virginia Department of Corrections ("VDOC") as defendants. Plaintiff alleges that defendants violated due process and retaliated against him for filing administrative grievances and a lawsuit by confining him at various security levels in ROSP. The parties have filed motions for summary judgment. After reviewing the record, I grant Defendants' motions for summary judgment and deny Plaintiff's motions for summary judgment.

I.

At ROSP on May 1, 2013, a correctional officer allowed a K-9 to bite Plaintiff's legs after intervening in a fight between Plaintiff and another inmate. Plaintiff's allegations flow from this incident. Plaintiff began mailing letters and filing administrative grievances about the K-9, officers' responses (or lack thereof) to grievances, and his placement in segregation.

Plaintiff begins his list of defendants' alleged conspiratorial and retaliatory acts as of May 24, 2013, when defendant Artrip, a Unit Manager for Delta Building, said Plaintiff would remain in segregation until Plaintiff stopped filing grievances. Artrip allegedly repeated the threat on June 20, 2013. On the next day, defendant correctional officer ("C/O") Murphy charged Plaintiff with a "111" infraction for allegedly breaking the window in his cell door.

During the hearing for the "111" charge on June 25, 2013, Plaintiff complained of changes made to the charging document, and defendant Counts, who was the ROSP Inmate Hearings Officer ("IHO"), delayed the disposition of the "111" charge. As a consequence of the delay, defendant Raiford, a Unit Manager for Delta Building, and defendant Lt. Fannin refused to conduct an Institutional Classification Authority ("ICA") review of Plaintiff's security status until the charge was adjudicated. Plaintiff alleges that this delay was used to unlawfully extend his time in segregation by forty-eight days.

On August 13, 2013, IHO Counts told Plaintiff that the "111" charge was dismissed. Defendants Raiford and Lt. Still released Plaintiff from segregation to Phase I, which Plaintiff refers to as general population. Nonetheless, Plaintiff was dissatisfied because he believed VDOC policy required him to be released to Phase II general population, which allows more privileges than Phase I.

On August 15, 2013, and in the presence of Sgt. Deel, Lt. Fannin, and other correctional officers, Unit Manager Kilborn demanded that Plaintiff stop filing grievances. When Plaintiff refused, Kilborn allegedly said, "Don't worry, you won't be in population (Phase-I) long, I assure you," while the officers nodded in agreement.

Plaintiff filed more grievances, and on August 29, 2016, Lt. Fannin allegedly tried to coerce Plaintiff into withdrawing the grievances, explaining that filing them would keep him incarcerated at ROSP and out of general population. Plaintiff refused to withdraw the grievances, and Lt. Fannin allegedly said, "You've been warned."

Six days later on September 3, 2013, Plaintiff was talking with fellow inmates in a line. Defendant C/O Madden allegedly told Plaintiff to "shut the fuck up and turn around," to which Plaintiff replied, "Fuck you, I can talk to him if I want[] to[]." C/O Madden next told Plaintiff,

2

"Either turn around in line or go back to the building." In response, Plaintiff pointed to the building and "verbally indicat[ed] [his] choice." C/O Madden nodded in agreement, and Plaintiff walked toward the building. However, Sgt. Deel intercepted Plaintiff and directed him to segregation for violating an institutional rule that prohibits cursing at staff. After being placed in segregation, Plaintiff learned he would be charged instead with a "129" infraction for approaching an officer in an intimidating manner. On September 11, 2013, IHO Counts found Plaintiff guilty of the "129" charge and revoked Plaintiff's visitation and phone privileges for ninety days. This institutional conviction was a basis to move Plaintiff from general population and into the Structured Living segregation program.

A week later, Plaintiff began helping inmates file administrative grievances about their personal property. When Artrip learned of this fact, he allegedly told Plaintiff, "I will find a nice spot for you in Charlie Building," which is where the inmates at the highest security level – level 6 – are held.

Two days later on September 20, 2013, Plaintiff was moved from Structured Living to Security Level 6 in the Charlie Building. Plaintiff complains that he did not receive an ICA hearing or have his transfer approved by the VDOC's Central Classifications Services, which allegedly violated VDOC policies. Plaintiff filed a grievance on September 27, 2013, about the reclassification to Security Level 6. None of his grievances or appeals were successful.

Even though Plaintiff had been charge free for ninety days and did not have a "segregation qualifier charge," the ICA decided on December 2, 2013, that Plaintiff would remain on SM-0 status, which Plaintiff alleges violated VDOC policies. Defendant Lt. Franklin allegedly told Plaintiff, "If [you] come over here (C-Building) appealing every decision, [you]

3

would remain on SM-0 status." Plaintiff did not appeal the ICA's decision and was approved for SM-1 status on January 27, 2014.

On December 8, 2013, Plaintiff commenced the civil action Wall v. Looney, No. 7:13-cv-00587, in this court about being bitten by the K-9 on May 1, 2013. On February 20, 2014, the court ordered that waivers of service of process be mailed to the Office of the Attorney General of Virginia on behalf of the defendants in that case. The only defendants in both that earlier action and this action are ROSP Warden R. Mathena and VDOC Regional Administrator G. Hinkle.

On March 3, 2014, Lt. Day informed Plaintiff he was approved for SM-2, but Plaintiff was dissatisfied because he believed VDOC policies should have caused him be released to Phase I general population. Kilborn allegedly again threatened Plaintiff about grievances on March 21, 2014, and when Plaintiff refused to withdraw them, Plaintiff remained in segregation at SM-1. After spending approximately ninety-nine days at SM-1 status, Plaintiff was moved to SM-2 status on May 5, 2014. Plaintiff's ICA hearings on May 21 and August 8, 2014, resulted with him remaining on SM-2 status. Plaintiff filed grievances about being held at SM-2 status to no avail.

On August 12, 2014, defendant Turner, a Unit Manager, told Plaintiff he would be released to Phase I general population if space became available, which Plaintiff "knew" to be untrue. On August 15, 2014, a counselor allegedly told Plaintiff he would not be moved back into Phase I because Plaintiff "pissed somebody off in Delta Building and they don't want you back over there." Plaintiff believes that the statement described Raiford, a Unit Manager of Delta Building, who Plaintiff had complained about in grievances.

4

Plaintiff speculates that by August 20, 2014, C/O Akers realized that Plaintiff had filed the lawsuit about the K-9 and, consequently, charged Plaintiff with a "111" infraction for allegedly sewing a hat out of a t-shirt sleeve. Before the "111" charge was heard, Plaintiff had a parole hearing on August 28, 2014, and the denial of parole issued on October 9, 2014, allegedly mentioned that the "129" charge for approaching an officer in an intimidating manner in September 2013 "seriously affected" the decision to deny parole.

On September 3, 2014, defendant IHO Mullins dismissed the "111" charge for procedural error. On September 30, 2014, Plaintiff was moved from SM-2 to Phase I general population after being at SM-2 for approximately 149 days and at Level-S for approximately 378 days.

On November 5, 2014, Plaintiff received the court's memorandum opinion and order denying a motion for summary judgment in the civil action about the K-9. A separate order noted a trial date was scheduled for March 9, 2015.

On November 6, 2014, C/O Lynch, a different K-9 handler than the one involved in the lawsuit, charged Plaintiff with an allegedly false and retaliatory "212" infraction for "threatening bodily harm" to ensure Plaintiff's removal from Phase I general population and because of the K-9 lawsuit. C/O Lynch alleged that Plaintiff said to him, "I'll get you the next time I come to the yard." Plaintiff was placed in pre-hearing segregation until IHO Counts conducting the hearing on November 17, 2014. IHO Counts found Plaintiff guilty of threatening bodily harm and fined him $12.00. IHO Counts allegedly did not disclose in her subsequent hearing report Plaintiff's allegedly threatening statement.

Plaintiff claims that defendants conspired to retaliate and did retaliate against him for filing administrative grievances and the civil action about the K-9. Additionally, Plaintiff argues

5

that that Mathena and Hinkle are liable for deeming his various grievances as unfounded and upholding the unfounded decisions, respectively.

Plaintiff claims that defendants violated due process during the September 11, 2013, and November 17, 2014, disciplinary hearings. Plaintiff further claims due process was violated when defendants did not conduct an ICA hearing within the ninety day limit provided under VDOC policy and when he lost access to outside recreation by staying in prehearing detention for thirty-two days.

Plaintiff also alleges state law claims of negligence, trespass, and false imprisonment. Plaintiff further alleges he suffered unspecified "mental or emotional" injuries as a result of these alleged violations.

## II.

The parties argue that they are entitled to summary judgment. A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this

6

burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

Defendants further argue that they are entitled to qualified immunity in their individual capacities.[1] Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

## III.
### A.

Plaintiff claims that the defendants conspired to retaliate, and did retaliate, for Plaintiff's grievances and the prior civil action about the K-9. Because Plaintiff fails to establish the deprivation of a federal right, Defendants are entitled to qualified immunity and summary judgment for these claims.

---

[1] The Eleventh Amendment prohibits Plaintiff from recovering damages against Defendants in their official capacities. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995).

7

In the Fourth Circuit, it has been repeated that inmates' claims of retaliation are "treated with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994)). "Claims of retaliation must . . . be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." Adams, supra.

To state a First Amendment § 1983 retaliation claim, a plaintiff must establish (1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation. Freeman v. Texas Dept. of Criminal Justice, 369 F.3d 854, 863 (5th Cir. 2004); see, e.g., Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000). An inmate must present more than "naked allegations of reprisal." Adams, 40 F.3d at 74.

For the third element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks and citations omitted). This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship. Balt. Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006). Because "conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, . . . a plaintiff need not actually be deprived of . . . First Amendment rights in order to establish First Amendment retaliation." Nonetheless, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." Constantine, 411 F.3d at 500.

8

The test for causation, the fourth element, requires an inmate to show that, but for the exercise of the protected right, the alleged retaliatory act would not have occurred. Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998); see Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996) ("[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive[.]").

To establish a civil conspiracy under § 1983, a plaintiff must present evidence that defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the deprivation of the plaintiff's constitutional right, like access to courts. See, e.g., Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992). To survive a properly supported motion for summary judgment, a plaintiff's evidence must, at least, reasonably lead to the inference that defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan. Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).

## B.

Filing grievances cannot form the basis of a retaliation claim in this circuit because, pursuant to Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994), "there is no constitutional right to participate in grievance proceedings."[2] Furthermore, an inmate does not have a constitutionally

---

[2] See Booker v. S.C. Dep't of Corr., 583 F. App'x 43, 44 (4th Cir. 2014) (unpublished) (reversing a grant of summary judgment on an inmate's First Amendment retaliation claim where the inmate alleged prison officials retaliated via a disciplinary charge for his grievance about mail but, notably, offered no opinion whether the inmate's grievance was protected speech); but see Wright v. Vitale, No. 91-7539, 1991 U.S. App. LEXIS 15230, at *2, 1991 WL 127597, at *1 (4th Cir. July 16, 1991) (unpublished) (indicating that an inmate's claim about lost visitation privileges in retaliation for filing grievances "could state a constitutional claim" (citing other appellate courts' opinions)); Gullet v. Wilt, No. 88-6797, 1989 U.S. App. LEXIS 21274, at *4-5, 1989 WL 14614, at *2 (4th Cir. Feb. 21, 1989) (unpublished) (noting an inmate's First Amendment rights were implicated by his "claim that he is being transferred [to another prison] because prison officials are retaliating for [his] numerous institutional grievances," but concluded that he did not state a claim because the prison had legitimate, non-retaliatory reasons for the transfer (citing other appellate courts' opinions)); see also Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that unpublished decision are not afforded precedential value and "are entitled only to

9

Case 7:15-cv-00097-JLK-RSB   Document 57   Filed 09/14/16   Page 9 of 15   Pageid#: 591

protected right to provide legal advice to other inmates. Shaw v. Murphy, 532 U.S. 223, 228 (2001). Accordingly, Defendants' motion for summary judgment must be granted to the extent the claims of conspiracy and retaliation are based on filing administrative grievances for himself or other inmates. However, I will assume the existence of the first element as to the filing of the civil action about the K-9 because "[t]he filing of a lawsuit carries significant constitutional protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to courts." Am. Civil Liberties Union, Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993); see, e.g., Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978).

Nonetheless, Plaintiff fails to establish retaliation or a conspiracy in his litany of prison life as a consequence of the lawsuit about the K-9. The only two instances worth noting are the accusations against C/O Akers and K-9 Officer Lynch. In these instances, Plaintiff fails to establish C/O Akers' or K-9 Officer Lynch's intent to retaliate for filing the prior civil action or that the alleged retaliatory act would not have occurred but for filing that civil action. Also, Plaintiff offers nothing but his speculation that C/O Akers and K-9 Officer Lynch positively or tacitly came to a mutual understanding to file charges against Plaintiff.

Regarding K-9 Officer Lynch, Plaintiff believes K-9 Officer Lynch issued a "false" 212 charge as retaliation for the lawsuit and to ensure Plaintiff was removed from Phase I general population. K-9 Officer Lynch accused Plaintiff of saying to him, "I'll get you the next time I come to the yard." Notable, however, is the fact IHO Counts found Plaintiff guilty and fined him

---

the weight they generate by the persuasiveness of their reasoning"); Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996) ("Since unpublished opinions are not even regarded as binding precedent in our circuit, such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity.").

10

$12.00. Thus, the charge was not "but for" the civil action; it was "but for" threatening K-9 Officer Lynch. Cf. Wolff v. McDonnell, 418 U.S. 539, 564-68 (1974) (describing due process protections when prison disciplinary hearing results in deprivation of a liberty interest); see, e.g., Cochran, 73 F.3d at 1317 ("In the prison context, courts treat claims of retaliation with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct.").

Regarding C/O Akers, Plaintiff speculates that C/O Akers realized that Plaintiff had filed the lawsuit about the K-9 by August 20, 2014, and, consequently, issued a fabricated institutional "111" charge for allegedly sewing a hat out of a t-shirt sleeve. At the disciplinary hearing, Plaintiff argued for dismissal because staff modified the date and time the charge was served on him. The 111 charge was dismissed on September 3, 2014, due to Plaintiff's procedural objection, and Plaintiff does not provide evidence plausibly suggesting the charge was fabricated. Furthermore, Plaintiff was released from prehearing detention in September 2014, and Plaintiff fails to establish that the brief stay in pre-hearing segregation implicates a federal right on its own or would likely deter a person of ordinary firmness from filing a lawsuit. Indeed, it did not deter Plaintiff; he successfully prosecuted his civil action, terminating in a jury award of damages. See Constantine, 411 F.3d at 500 (noting a plaintiff's actual response to the retaliatory conduct is indicative of a chill to the protected activity). Accordingly, defendants are entitled to qualified immunity and summary judgment for the claims of retaliation and conspiracy.

IV.

Plaintiff claims the Fourteenth Amendment's guarantee of due process was violated because he was kept in segregation for periods of time longer than he believed to be necessary

11

and because he did not receive fair or timely ICA hearings as required by VDOC policies. Defendants are entitled to qualified immunity and summary judgment for these claims.

To state a procedural due process violation, a plaintiff must first identify a protected liberty or property interest.[3] Prieto v. Clarke, 780 F.3d 245, 251 (4th Cir. 2015). To establish a protected liberty interest, the plaintiff must "[1] point to a Virginia law or policy providing him with an expectation of avoiding the conditions of confinement and [2] demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." Id. at 252; see, e.g., Sandin v. Conner, 515 U.S. 472, 484 (1995).

Even if Plaintiff shows a justifiable expectation of avoiding segregation at ROSP, he fails to demonstrate that the conditions he experienced intermittently in segregation were so harsh as to be an atypical and significant hardship in relation to the ordinary incidents of prison life. See, e.g., Sandin, supra; Wolff, 418 U.S. at 563-64. Plaintiff does not describe the differences in conditions of confinement between the "general population" environment of Phase I at ROSP and the levels of special management at ROSP. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997) (noting that determining whether conditions are atypical and substantially harsh in relation to the ordinary incidents of prison life is a fact-specific, comparative exercise). Unlike the continual twenty-year assignment to segregation discussed in Incumaa v. Stirling, 791 F.3d 517, 519 (4th Cir. 2015), Plaintiff repeatedly shifted in and out of administrative segregation

---

[3] Alternatively, a plaintiff could show that the conditions of confinement exceed the imposed sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. However, that legal test does not apply here. See, e.g., Meachum v. Fano, 427 U.S. 215, 224-25 (1976) ("The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons. . . . Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.").

status or prehearing detention status for brief periods: between May 24, 2013, after accepting the penalty offer for fighting with another person, and August 22, 2013; between September 3, 2013, after being accused of approaching an officer in an intimidating manner, and September 30, 2014; and between November 6, 2014, after being accused of threatening bodily harm, and approximately December 8, 2014, after the ICA recommended that Plaintiff be released back to Phase I general population. Plaintiff's intermittent stays in administrative segregation were frequently reviewed with an individualized assessment of his recent conduct and correctional goals.

Although Plaintiff alleges that defendants violated VDOC procedures, a claim that prison officials have not followed their own independent policies or procedures also does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue). As noted earlier, Plaintiff does not have a federal right to access a prison's administrative grievance system, and Plaintiff's complaints about how defendants Ponton, Jarvis, Hinkle, and Mathena answered grievances and grievance appeals are not sufficient here to state actionable claims. See Adams, 40 F.3d at 75; see also DePaola v. Ray, No. 7:12cv00139, 2013 U.S. Dist. LEXIS 117182, at *23, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013) (Sargent, M.J.) ("A superior's after-the-fact denial of a grievance falls far short of establishing § 1983 liability." (citing Brooks v. Beard, 167 F. App'x 923, 925 (3rd Cir. 2006))).

There is no federal entitlement for a Virginia inmate to be assigned a lower security level after ninety-days' good behavior. To hold otherwise would disregard the peculiarities of the ROSP inmate population whose penchant for violence is not eliminated despite apparent

13

compliant, polite, and cooperative behaviors and attitudes for ninety days. It is reasonable for the VDOC's policies to incentivize the proper behavior of higher security inmates who need structure to conform behaviors to pro-social, rehabilitative goals while erring on the side of maintaining institutional security and safety. See, e.g., Johnson v. California, 543 U.S. 499, 529 (2005) (Scalia, J., dissenting) ("[E]xperienced prison administrators, and not judges, are in the best position to supervise the daily operations of prisons across this country."); O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987) ("We take this opportunity to reaffirm our refusal . . . to substitute our judgment on . . . difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." (internal quotation marks and citation omitted)).

Accordingly, Defendants are entitled to qualified immunity and summary judgment for the due process claims because Plaintiff fails to establish atypical and significant conditions and fails to establish any clearly-established law that would have put a defendant on notice that his intermittent transfers into administrative segregation violated federal law. See, e.g., Anderson v. Creighton, 483 U.S. 635, 640 (1987) (noting the unlawfulness of an act must be apparent in light of pre-existing law); Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (stating clearly established law in the Fourth Circuit refers to decisions of the Supreme Court of the United States, the Court of Appeals for the Fourth Circuit, and the highest court of the state in which the case arose).

14

Case 7:15-cv-00097-JLK-RSB   Document 57   Filed 09/14/16   Page 14 of 15   Pageid#: 596

## V.

For the foregoing reasons, I grant Defendants' motions for summary judgment and deny Plaintiff's motions for summary judgment for the federal claims. I decline to exercise supplemental jurisdiction over any state-law claim pursuant to 28 U.S.C. § 1367(c)(3).

**ENTER**: This 14th day of September, 2016.

/s/ Jackson L. Kiser
Senior United States District Judge

15

Case 7:15-cv-00097-JLK-RSB   Document 57   Filed 09/14/16   Page 15 of 15   Pageid#: 597